UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ROXANNE MARTONE, individually and as heir-at-law to the ESTATE OF MICHAEL MARTONE | § § § § | |
| PLAINTIFF | § § | |
| v. | § § § | CIVIL ACTION NO. 3:13-cv-283 |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, OWEN MURRAY, RICHARD ALFORD, JAMES JONES, LANNETTE LINTHICUM, PATRICIA RYE, PEGGY McCLESKEY, and KERRY COLLARD, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH. | § § § § § § § § § § § § § | JURY DEMAND |
| DEFENDANTS | § | |

## COMPLAINT

Michael Martone died in Texas Department of Criminal Justice custody because Defendants, Texas corrections officials, fail to protect prisoners from dying from heat stroke in the brutally hot TDCJ Huntsville (or "Walls") Unit. Mr. Martone's daughter files this complaint seeking redress for her father who perished.

## STATEMENT OF CLAIMS

1.      Prisoners are dying of heat stroke while in Defendants' custody at prisons across Texas.

2.      The daughter of one of these men, Michael Martone, brings claims as heir-at-law and as a statutory wrongful death beneficiary.

3.      Plaintiff claims the individual defendants are liable under 42 U.S.C. §1983 for violating Martone's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment.

4.      Plaintiffs further claim TDCJ and the University of Texas Medical Branch caused Martone's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act). The Court has supplemental jurisdiction over state law claims.

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), as

Defendants UTMB and Murray reside in this district, and all Defendants reside in this state.

## PARTIES

7.   Plaintiff Roxanne Martone, Mr. Martone's natural daughter, sues in her individual capacity as a statutory beneficiary under the Texas Wrongful Death Act and as representative of Martone's estate. At the time of his death, Martone had no minor children. He died intestate, and there were no probate proceedings arising from his death, as none were necessary. Roxanne Martone is a resident of Harris County, Texas.

8.   Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, and compensatory damages. He can be served with process at 209 W. 14th St., Austin, TX 78701.

9.   Defendant James Jones was the warden at the Huntsville Unit at all relevant times. At all relevant times, Jones was acting under color of law and as the

3

agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief. He can be served with process at 815 12th St., Huntsville, TX 77348.

10. Defendant Rick Thaler is the director of TDCJ's Correctional Institutions Division. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in Walker County. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

11. Defendant William Stephens is the deputy director of TDCJ's Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times,

4

Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

12. Defendant Richard Alford was the regional director for TDCJ's "Region I," and supervises thirteen prisons, including the Huntsville Unit. As the regional director, he is responsible for the supervision of all personnel at the Huntsville Unit. Alford was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Alford is a resident of Walker County, Texas.

13. Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Huntsville Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is sued in his individual capacity for punitive and

compensatory damages.

14. Dr. Lannette Linthicum is the director of TDCJ's Health Services Division. She is responsible for supervision of all medical care providers at all TDCJ facilities. She supervises provision of medical, dental, pharmaceutical, counseling, geriatric, and obstetric services to all TDCJ inmates. As a member of the Correctional Managed Health Care Committee, she helps formulate policies and procedures for all TDCJ facilities. She is sued in her individual capacity for punitive and compensatory damages. Linthicum is a resident of Walker County, Texas. She can be served with process at 3009A Hwy 30 West, Huntsville, TX 77340.

15. Defendant Patricia Rye was a registered nurse working in the infirmary at the Estelle Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. She is sued in her individual capacity for punitive and compensatory damages.

16. Defendant Peggy McCleskey was a licensed vocational nurse working in the infirmary at the Huntsville Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. She is sued in her individual capacity for punitive and compensatory damages.

17. Defendant Kerry Collard was a correctional officer at the Huntsville Unit at all relevant times, and acting under color of law and as the agent, and, as a

matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages.

18. The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Huntsville Unit, a public facility with programs and services Martone and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. It can be served with process by serving Brad Livingston, its executive director, at 861 B IH 45 North, Huntsville, TX 77320.

19. The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Huntsville Unit. UTMB is a recipient of federal funds. UTMB is sued for compensatory relief. It can be served with process by serving its president, David L. Callender, at 301 University Blvd., Suite 6.100, Administration Building, Galveston., TX 77555-1006.

## FACTS

**Extreme Temperatures are Killing Texas Prisoners**

20.    According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Michael Martone, died at TDCJ's brutally hot Huntsville Unit.

21.    Like most other TDCJ prisons, the Huntsville Unit's inmate living areas are not air conditioned, and heat index or apparent indoor temperatures (see chart below) routinely exceed 100 degrees.

22.    These temperatures last late into the night, providing no relief to prisoners. Even early in the morning, indoor apparent temperatures are sweltering.

23.    As each of the individual Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2011, temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

24.    In fact, TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies well before 2011.



**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**
Caution    Extreme Caution    Danger    Extreme Danger

25.    The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

26.    The indoor apparent temperatures routinely reach the orange "danger" and red "extreme danger" zones indoors at the Huntsville Unit. According to NOAA, when the apparent temperature reaches "extreme danger" heat stroke is "imminent." Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

27.    It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like depression or

hypertension, or who take certain medications, like psychotropics or diuretics, are much more vulnerable to extreme temperatures. While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people with these medical conditions and disabilities. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

28.    Since 2007, fourteen men have died in TDCJ prisons from heat-related causes.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|------|---------------|------------|-------------|-------|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

29.    In fact, it is likely that there were more heat related injuries and deaths

as hyperthermia is known to be an underreported cause of death by medical

examiners and pathologists.   And many more prisoners and TDCJ employees working in the extreme heat suffered heat exhaustion and other heat related illnesses.

30.     Two men who died, Martone and Daniel Alvarado, died at the Huntsville Unit under Warden James and Director Alford's supervision.

31.     These fourteen men all shared certain characteristics. They took psychotropic drugs to treat some form of mental illness, suffered from diabetes or hypertension, or took diuretics to treat hypertension. Many arrived in non-air-conditioned TDCJ facilities shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night, or were found dead early in the morning. And they all died in late July and August – the hottest days of the Texas summer.

32.     Even though ten men died of heat stroke in 2011, high-ranking TDCJ officials did not consider these deaths a serious problem. In fact, in the face of these deaths, TDCJ officials stated TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, Defendants Alford and Jones took no action to protect future prisoners, like Martone, in the face of TDCJ's obviously inadequate procedures.

33.     Alford's direct supervisors, Defendants Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke

were regularly discussed at meetings Thaler and Stephens held with their deputies, including Alford. Even though the existing policies were obviously inadequate, Livingston, Thaler, Stephens and Alford continued to follow the same deadly course of conduct. Air conditioning the Huntsville Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

34.     Even TDCJ's highest ranking medical official, Dr. Linthicum, took no action to protect the patients in her care from the extreme temperatures. Despite the escalating death toll, she made no changes to TDCJ policy, and failed to provide training to medical staff unable to even diagnose the early symptoms of heat stroke.

35.     Nor did Executive Director Livingston take steps to cool the non-air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years, and deaths from heat stroke were happening at an alarming rate in July and August 2011. In fact, even today – after 14 deaths– Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

36. UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and screening materials, even as patients under its care died from hyperthermia. Dr. Murray is responsible for

ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs.

37. Despite having the responsibility of ensuring prisoners receive adequate care, Dr. Linthicum and Dr. Murray, on behalf of UTMB, have been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat. In fact, Dr. Linthicum and Dr. Murray know that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from depression or hypertension, or who are over forty years of age. Likewise, Dr. Linthicum, as TDCJ's chief medical officer, and Dr. Murray, as the chief physician for UTMB concerning correctional care, know that prisoners with such conditions are endangered if placed into brutally hot conditions.

38. Likewise, Dr. Linthicum and Dr. Murray have long known TDCJ does not air condition inmate living areas. Dr. Murray has even given press tours in which he described cells as "blazing hot" in summer and "bitter cold" in winter. Moreover, as part of their duties as director of TDCJ's medical care program and head of correctional care for UTMB, Dr. Linthicum and Dr. Murray have personally examined nearly all of the facilities they are responsible for providing

care to and, upon information and belief, have visited the Huntsville Unit. Linthicum and Murray are also, of course, well aware of the extremely hot and humid conditions that regularly present themselves each summer in Texas. Dr. Linthicum and Dr. Murray were thus aware that in August 2011, the Huntsville Unit's housing areas were extremely hot and dangerous for individuals like Martone.

39.    For TDCJ to make a necessary capital improvement like air conditioning the prisons, action by the most senior TDCJ officials, including Defendant Livingston, would be needed. Despite prisoners continuing to die from extreme temperatures, Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

40.    These hazardous conditions serve no penological purpose.

**TDCJ Denied Martone Safe Housing**

41.    Defendants TDCJ, Livingston, Thaler, Stephens, Alford, Linthicum, Murray and Jones have chosen not to take any action to house prisoners in safe conditions, even though they know many prisoners have medical conditions that make the extreme heat they know Huntsville Unit prisoners endure deadly.

42.    Air-conditioned housing is available at some TDCJ prisons, but not the Huntsville Unit. Of the 97 state-operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells

15

(including death row) are routinely air conditioned. While inhumane heat conditions are never justified, it is ironic that prisoners who obediently serve their time do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death live in safe conditions.

43.     Of course, areas like Livingston, Alford, Stephens, Thaler, Linthicum, Murray, and Jones' offices are air conditioned – a comfortable 75 degrees.

44.     TDCJ even air conditions the armory at the prison because it considers possible damage to its weaponry more important than possible, or even likely, death to the inmate population.

45.     Despite knowing the dangers temperatures above 90° Fahrenheit pose to prisoners, TDCJ and UTMB policies only provide protections from heat to inmates performing outdoor prison labor. If a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." TDCJ and UTMB's policies, however, make *no* accommodations for prisoners' housing assignments, or locations they are required to live in, even though temperatures in living areas routinely reach the "danger" and "extreme danger" zone. TDCJ and UTMB policy only address preventing heat-related injuries "in the workplace."

46.     Similarly, Dr. Murray and UTMB have formulated work policies designed to minimize possible heat exhaustion and heat stroke among inmates.

16

However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the Huntsville Unit and other prisons routinely exceed 100 degrees in the summer, Dr. Linthicum and Dr. Murray have not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat.

47.   UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies do not contemplate special  or safe housing for prisoners with heat-sensitive disabilities.

48.   Significantly, Defendants chose not to provide prisoners at the Huntsville Unit, including Martone, opportunities to cool off in an air conditioned environment. Though some parts of the Huntsville Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners are not given a chance to cool off.

49. As a consequence, inmates with hypertension and depression, as well as inmates on psychotropic or diuretic drugs, as well as older people at risk, are regularly housed in extreme temperatures and in danger of suffering heat stroke.

50. Even though from 2007 to the present at least fourteen inmates have died from heat stroke due to extreme heat inside dorms that are not air conditioned or otherwise cooled, Defendants made no changes to their policies or procedures.

Despite the fact that inmates are dying at an alarming rate from heat stroke, Linthicum, Murray and UTMB have done nothing to try and protect the weakest inmates TDCJ houses.

51.     And despite the fact that more than twelve prisoners have died from heat stroke in the past two years, TDCJ officials said publicly they consider adding any air conditioning to TDCJ's prisons a waste of money.

**People with Certain Medical Conditions Martone Suffered from are Especially Vulnerable to Extreme Temperatures**

52.     TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

53.     TDCJ and UTMB policies specifically acknowledge certain medical conditions, like hypertension, depression and other psychiatric conditions affect heat tolerance.

54.     TDCJ also advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and psychotropics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhuman conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

55.    Unfortunately, many TDCJ inmates suffer from these conditions, including Martone and the other men who died.

56. TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Alford, Linthicum, Jones, and Murray know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury.

**The Huntsville Unit Does Not Have Around the Clock Medical Staff**

57. Moreover, Dr. Murray, Dr. Linthicum, and UTMB choose not to employ any medical staff at the Huntsville Unit between 6:00 p.m. and 9:00 a.m., even though over 1,700 men are housed there every night and significant numbers (greater than 10%) suffer from hypertension, take medications for serious mental illnesses, or are otherwise at greater risk from the extreme heat.

58. Instead, prisoners needing after-hours medical care are evaluated by videoconference by nurses working at the nearby Estelle Unit, who are not capable of making medical treatment decisions.

59. In fact, by law, licensed vocational nurses cannot make diagnoses and must practice under the supervision of a doctor or registered nurse. Even during the day, licensed vocational nurses at the Huntsville Unit are left alone to make critical medical decisions. Thus, Dr. Linthicum, Dr. Murray and UTMB purposefully do not provide access to doctors or competent medical providers capable of providing treatment recommendations from 6:00 p.m. to 9:00 a.m.

60. Livingston, Thaler, Stephens, Alford, Linthicum, Murray, and UTMB made this decision for financial reasons, despite knowing it placed inmates at risk during the evening and the middle of the night, and at grave risk in emergency situations where medical care was immediately needed.

61. The TDCJ and UTMB employees at the Huntsville Unit, including Jones, McCleskey, Rye, and Collard, knew there was no medical staff at the facility after 6:00 p.m., and that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance.

**Correctional Officers and Nurses at the Huntsville Unit are Inadequately Trained**

62.     Because the apparent temperatures are so high, it is imperative TDCJ and UTMB's low-level employees recognize heat-related illnesses and get prisoners emergency medical care quickly. The training TDCJ and UTMB provide the officers and nurses responsible for day-to-day supervision of prisoners, however, is grossly inadequate and effectively amounts to no training at all. A training circular is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated after Mr. Shriver and Mr. Robles died in 2007 – or, even more shamefully, after the ten prisoners died in 2011 (as discussed below), and two more died in 2012.

63.     UTMB and TDCJ medical staff are not involved in teaching line officers and nurses to identify heat-related illness – even though when a prisoner needs medical care, the low-level officers and nurses are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

64. As the warden and regional director, Jones and Alford are directly responsible for training the front-line officers charged with protecting prisoner's lives. Linthicum and Murray are similarly responsible for training the nurses who staff UTMB's infirmaries. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate training and for supervisors Alford and Jones. Each failed to provide adequate training and supervision, and many people died as a consequence.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes and Prisoners Died as a Consequence**

65.     Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, arrived at the Byrd Unit less than 24 hours before his death. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

66.    Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

67.    Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions similar to Martone's disabilities, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

68.    Alford supervises TDCJ operations at the Byrd Unit, and would have been well aware that two men died there from heat stroke in 2007. Despite this, he took no action to ensure other men in the prisons he supervises suffered a heat-related illness or death.  Jones also knew about these deaths.

69. Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Linthicum, Murray, Thaler and Stephens. But even though two men with serious disabilities died under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they continued to operate TDCJ while exposing individuals in its care to temperatures they knew endangered human life.

70. Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

71. In August 2008, Eugene Blackmon, an elderly man suffering from hypertension, sued concerning the extreme heat he endured at a TDCJ prison. UTMB and TDCJ officials at the highest levels were involved in TDCJ's defense, but still made no changes.

**As Men Died in 2011, TDCJ and UTMB Still Failed to Make Changes And Prisoners Died As a Consequence**

72. On July 22, 2011, Larry Eugene McCollum died of heat stroke. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ prison near Dallas. He was hospitalized at Parkland Hospital until life-support was withdrawn on July 28, 2011.

73. Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit on July 24, 2011. He received medical attention at the prison, and his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011.

74. A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention.

75.     The next day, Robert Allen Webb, 50, died at the Hodge Unit. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him very susceptible to heat stroke.

76.     Later that week, Alexander Togonidze, 44, died of a heat stroke at the Michal Unit. Mr. Togonidze had been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

77.     Earlier the same day Mr. Martone died, Charles Cook, 53, was found dead in his cell after suffering a heat stroke at TDCJ's Hodge Unit.

78.     Throughout the rest of the summer, four more men, all suffering from similar disabilities known to make them vulnerable to extreme heat, died from heat stroke in TDCJ's prisons.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

79.     Livingston, Thaler, Stephens, Alford, Jones, Linthicum, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable steps to protect the health and safety of prisoners.

80.     And Livingston, Thaler, Stephens, Alford, Linthicum, Murray and Jones all knew inmate living areas at the Huntsville Unit were not air conditioned,

and that the apparent temperatures routinely skyrocketed over 100 degrees during the hot Texas summers.

81.    At all relevant times, Livingston, Thaler, Stephens, Alford, Linthicum, Murray and Jones knew that extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with depression and mental illnesses in extremely hot facilities like the Huntsville Unit. Moreover, TDCJ's policies and practices, which Livingston, Thaler, Stephens, Alford, Linthicum, Murray, and Jones knew about, make no accommodation for people with mental illnesses or hypertension during periods of extreme temperatures.

82.    Alford, Jones, Livingston, Thaler, Stephens, Collard, Rye, McCleskey and Linthicum worked at the Huntsville Unit, or in the city of Huntsville, every day, and knew about the extreme temperatures the area experiences each summer.

83.    Likewise, Murray and other UTMB executives (including senior physician Charles and Glenda Adams) know Texas summers are extremely hot – and that temperatures inside the prisons remain "blazing" high for weeks on end.

84. Additionally, Alford, Jones, Thaler, Stephens, Linthicum, Murray, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months. Incredibly, despite their knowledge of these dangers, TDCJ and UTMB have no

policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas.

85. Instead of having a formal policy, TDCJ relies on an informal email sent by Thaler and Stephens that acknowledges the dangers of heat to prisoners, but that does not protect a prisoner with heat-sensitive medical conditions from extreme temperatures. Instead, it relies on measures prove inadequate when men died in 2007, like increasing water intake and providing additional fans, neither of which occurred at the Huntsville Unit. And neither of which cool the apparent temperature.

86. The email is also recycled each year – the text is virtually identical, and has not changed even after men began to die. Linthicum, Murray, Thaler and Stephens know the measures described in the email are inadequate, but have taken no action to improve TDCJ's response to heat-related emergencies.

87. High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes as far back as 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

88. Among other lawsuits, Livingston was a named defendant in *Blackmon v. Kukua*. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the

26

inmates are housed [at Mr. Blackmon's prison] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit. *Blackmon* went to trial in February 2011, just a few months before Martone died at the Huntsville Unit. While Livingston settled the lawsuit for money damages, he continued to expose prisoners, including those with heat sensitive disabilities like Martone, to extreme heat inside prisons.

89.     High-ranking UTMB officials were also dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician and Murray's deputy, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away." In other words, Murray and UTMB – in the face of people dying from heat stroke at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

90.     Murray was well aware of this and agreed with Dr. Adams despite knowing about the dangers extreme heat posed. As a result, UTMB providers at all prisons, including the Huntsville Unit, continued to house inmates vulnerable to the heat in dangerously hot temperatures during the summer months without any housing restrictions.

91.     In fact, after fourteen people have died from heat stroke in TDCJ units in which UTMB provides health care, Linthicum, Murray and UTMB continue to

turn a blind eye and expose the most vulnerable to dangerous extreme heat inside the prison.

92.     As the conditions at the Huntsville Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Martone, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled by air conditioning or temporary cooling system/unit, or to make sure inmates with serious mental illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat. A decision, of course, they made from the comfort of their own air conditioned offices.

93.     TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Linthicum, Murray, Thaler, Stephens, Alford and Jones routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison.

94.     UTMB, TDCJ, Livingston, Thaler, Stephens, Alford, Linthicum, Murray, and Jones – at a minimum – failed to take reasonable steps to safely house prisoners at the Huntsville Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Linthicum, Murray, Thaler, Stephens,

Alford, and Jones were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

95.    Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Thaler. They have refused to act, authorize or otherwise approve actions to address these conditions.

96. UTMB, TDCJ, Livingston, Thaler, Stephens, Alford, Jones, Linthicum, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Huntsville Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Linthicum, Murray, Thaler, Stephens, Alford, and Jones were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

97.    Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

98.    At the time of Martone's death, the law was clearly established that temperatures exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Linthicum, Murray, Thaler, Stephens, Alford, and Jones are not entitled to qualified immunity.

99.    Plainly, the conditions at the Huntsville Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical

illness, injury, or death to Martone, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, prisoners in TDCJ custody.

**Martone was Disabled**

*Hypertension*

100.    Hypertension is a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

101.  As Defendants well know, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

102.  Diuretic medications are frequently used to treat hypertension. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus

increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. UTMB and TDCJ policies recognize diuretics increase a patient's risk of heat stroke.

103.   Beta blockers are also used to treat hypertension. These drugs reduce the body's ability to sweat, which is necessary to dissipate heat. An inability to perspire normally substantially increases a person's risk for heat-related illnesses and death.

104.   As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limited the operation of one's respiratory, circulatory, and cardiovascular systems.

105.   UTMB prescribed several drugs to treat Martone's hypertension, including Lopressor and Inderal (beta blockers) and hydrochlorothiazide (a diuretic).

*Depression*

106. Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression, like Martone, experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

107. UTMB policy recognizes patients taking medications like Pamelor, a tricyclic antidepressant prescribed to Mr. Martone, are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

*Obesity*

108. Mr. Martone was also very overweight. Shortly before his death, he weighed 309 pounds and was just over 6 feet tall.

109. People who are obese experience difficulty walking, standing, performing manual tasks, lifting, bending, and breathing.

110. TDCJ and UTMB policy specifically recognize that people who are overweight are at greater risk of heat-related illness and death.

*Disability Discrimination*

111. TDCJ and UTMB officials, including Livingston, Linthicum, Thaler, Stephens, Eason and Miller, know that many prisoners with hypertension and depression live in Texas prisons.

112. Here, TDCJ and UTMB discriminated against Mr. Martone, by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Mr. Martone access to TDCJ facilities and safe housing.

**Martone's Death**

113.   At the time of his death, Martone was fifty-seven.

114.   On the evening of August 8, 2011, the Huntsville area experienced temperatures over 100 degrees. That day, the heat in Huntsville was sweltering – a high of 101 degrees Fahrenheit, with up to 87 percent humidity. The heat index, the combination of temperature and humidity, made the air temperature feel like it was near 110 degrees. According to TDCJ's heat matrix, at these temperatures these temperatures are "dangerous."

115.   TDCJ officials even recorded indoor temperatures over 100 degrees inside the cellblocks that day.

116.   But Warden Jones did nothing. No one from UTMB or TDCJ did anything to cool the indoor temperatures or remove prisoners vulnerable to such extreme heat.

117.   And August 8, 2011 was not an aberration – it was the eighth consecutive day of temperatures over 100. In the past month, the high temperature only dipped below 95 on four days.

118.   Around 6:00 pm on August 8, 2011, Mr. Martone told Officer Kerry Collard, the guard supervising his cell block, that he had been feeling very sick the past two days, and had been throwing up. Collard sent Mr. Martone to the infirmary.

119.   Sgt. Ford escorted Mr. Martone to the infirmary. Martone told Ford he was experiencing difficulty breathing, dizziness, and feeling very dry "despite drinking mass amounts of water."

120.   There was no UTMB medical staff at the infirmary beyond a licensed vocational nurse, Nurse McCleskey. Licensed vocational nurses are not trained to make diagnoses, or provide anything beyond the most basic medical care. Even though over 1,700 men live in the Huntsville Unit, UTMB executives at the highest level made the intentional decision not to provide competent around the clock medical care at the prison.

121.   But McCleskey refused to even see Martone or take his vital signs because "she had other work to do." Uninterested in doing her job and performing even a basic evaluation of Martone, McCleskey simply preferred to make sure she left work on time.

122.   Instead of being evaluated by actual medical personnel capable of diagnosing and treating his condition, McCleskey had Mr. Martone seen by a registered nurse at another prison, Nurse Rye, via videoconference.

123.   Rye was as uninterested in treating Martone as McCleskey. Despite knowing Mr. Martone took medications that react dangerously with the heat to treat his disabilities, and he had been suffering classic symptoms of heat stroke for two days, Nurse Rye dismissed his concerns. Rye told Martone it was "nothing

serious." Rye merely said to drink water and "rest." She told him to go to sleep and "see medical when they returned in the morning."

124.   Rye did not take his temperature, or otherwise evaluate him for heat stroke. Despite his obviously precarious condition and request for help, Rye ordered the correctional officers to take Mr. Martone back to the cell block.

125.   UTMB made the deliberate decision that medical staff will leave the Huntsville Unit around 7 pm each day. Thus, Mr. Martone could not stay in the air conditioned infirmary to help him cool off before sending him back to the brutally hot cellblock.

126.   Collard noticed Martone returned to the cellblock approximately 30 minutes after he left. Martone did not return to his cell, but stayed in the common area, talking to himself. Because he was obviously still in distress, Collard asked him if he was alright. But Martone was only able to mumble and could not respond.

127.   Despite observing Martone was obviously suffering from a serious medical condition, Collard did nothing to help Martone.

128.   Less than an hour later, Officer Collard saw Mr. Martone grasping the bars on the cell block's windows, trying desperately to cool off. Mr. Martone began convulsing and collapsed as two other prisoners caught him. Collard believed he was having a seizure. As officers watched Martone, he began to slip in

and out of consciousness. He was disoriented, and could not answer the officers' questions.

129.   By this time, the UTMB medical staff had all left the prison.

130.   Though Martone was disoriented, losing consciousness, and convulsing, Collard, incredibly, did not call for an ambulance – even though he knew medical staff had left for the evening, and no one could treat Martone at the Huntsville Unit.

131.   After at least a 20 minute delay, Collard's supervisors finally called 911. An ambulance arrived shortly after 8:15 pm – about an hour after Martone first collapsed. Because the Huntsville Unit is in the middle of downtown Huntsville, an ambulance would typically, and certainly could, arrive within minutes of a 911 call.

132.   Martone was taken from Huntsville by helicopter to Hermann Memorial Hospital in Houston with an escort officer.

133.   Soon after he arrived in the emergency room, his vital signs crashed, and he was pronounced dead.

134.   TDCJ's internal investigation identified Martone's death as "heat related." At the time of his death, Mr. Martone's body temperature was 108. UTMB knew this as well.

135.   The next day, Stephens and other high-ranking TDCJ executives

received an email informing them "report says staff at [the hospital] told the escort officer that death could be heat-related."

## CAUSES OF ACTION

### EIGHTH AND FOURTEENTH AMENDMENT CLAIMS
(As to Defendants Livingston, Miller, Thaler, Stephens, Alford, Jones, Linthicum and Murray Only, in Their Individual Capacities)

136.   Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

137.   By subjecting Martone to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Linthicum, Murray, Thaler, Stephens, Alford and Jones acted with deliberate indifference to the his serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

138.   The extreme temperatures Defendants tolerated at the Huntsville Unit proximately caused Martone's untimely death.

139.   Further, Dr. Linthicum and Dr. Murray are responsible for making sure that TDCJ and UTMB's practices and policies do not endanger the lives of the patients treated by UTMB providers.  Despite knowing that many prisoners suffer from conditions and take medications — such as Pamelor, Lopressor, hydrochlorothiazide, and Inderal taken by Martone — that make them vulnerable

to the heat and endanger their lives in periods of extreme heat, Defendants Linthicum and Murray failed to place any restrictions on prisoner housing during periods of extreme heat.  Likewise, Linthicum and Murray permitted licensed vocational nurses to treat prisoners as if they were trained medical providers capable of making medical decisions, which they know they are not.  Additionally, Linthicum and Murray failed to train UTMB staff about the dangers extreme heat posed to prisoners, and especially to prisoners like Martone who suffered from mental health disabilities and who were on psychotropic medications.  As Dr. Linthicum and Dr. Murray were subjectively aware of the danger their actions posed to prisoners in Martone's condition, and was aware that several prisoners had died from heat stroke that summer before Martone, Dr. Linthicum and Dr. Murray were deliberately indifferent to the serious medical needs of prisoners like Martone, and to Martone in particular, and their actions were a proximate cause of Martone's death.

140.   Plaintiffs bring these claims through 42 U.S.C. §1983.

## EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
### (As to Defendants Collard, Rye, McCleskey, Linthicum, and Murray in Their Individual Capacities) (42 U.S.C. §1983)

141.   Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

142.   Rye and McCleskey failed to provide Martone medical care when officers brought him to the Huntsville Unit infirmary on the evening of August 8, 2011. Though he was brought by a correctional officer to the infirmary to receive medical treatment, Rye and McCleskey failed to even take his vital signs or perform any examination. This deliberate and knowing refusal to provide Martone care for his serious medical condition resulted in his death.

143.   Furthermore, Dr. Murray and Dr. Linthicum, as the supervising physicians, failed to supervise the medical staff operating under their supervision. This failure to supervise resulted in patients like Martone not receiving basic medical care. In Martone's case, the failure to provide basic care (such as checking his vital signs) proximately resulted in his death.

144.   Likewise, when Collard later observed Martone was still extremely hot and unresponsive – classic symptoms of an emergent heat stroke –he deliberately and knowingly delayed Martone's access to health care for his serious medical condition.

39

145.   Rye, McCleskey, and Collard's deliberate indifference to Martone's serious medical condition directly and proximately resulted in his death.

146.   Accordingly, the individual defendants are liable to the Plaintiffs under 42 U.S.C. § 1983.

### AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
(As to Defendants TDCJ and UTMB Only)

147.   TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, services, programs, or activities and reasonably modify such facilities, services, programs or activities to accomplish this purpose. 29 U.S.C. §794.

148.   Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. §§12131 et seq.

149. Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

150.   The Huntsville Unit is a facility, and its operation comprises services, programs or activities of TDCJ and UTMB for Rehabilitation Act, ADA, and

ADAAA purposes. Martone was otherwise qualified to receive the services of and participate in the programs or activities provided by TDCJ and/or UTMB at the Huntsville Unit.

151.   For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Martone was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities. Defendants TDCJ and UTMB knew Martone suffered from depression and hypertension, and was prescribed medications to treat his disabilities. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life.

152.   As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Martone, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

153.   As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Martone access to the facilities, services, programs or activities of the Huntsville Unit by reasonably accommodating his disabilities. These failures and refusals caused his death.

154.   Martone died as a direct result of TDCJ and UTMB's intentional discrimination. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

## NEGLIGENCE – TEXAS TORT CLAIMS ACT – PRESCRIPTION DRUGS
### (As to Defendant UTMB)

155.   As described above, UTMB employees negligently provided property, the prescription drugs to Martone.

156.   Use of these prescription drugs was dangerous in the conditions of extreme heat at the Huntsville Unit, and contributed to and were a proximate cause of Martone's death.

157.   Moreover, UTMB employees knew, or should have known the medications substantially increased Martone's risk of suffering fatal heat strokes prior to his deaths.

158.   UTMB had actual notice that Martone died as a result of the extremely hot conditions, lack of air conditioning and the effects of the drugs (Lopressor, Pamelor, Inderal, and hydrochlorothiazide) he was prescribed, and a subjective awareness that its fault contributed to Martone's death, within six months of Martone's death.

159.   Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

## DAMAGES

160.   Plaintiff is entitled to compensatory, punitive, presumed, and nominal damages against the individual Defendants in the maximum amounts allowed by law.

161.   Plaintiff is entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by law.

162.   As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff and were the moving force of Martone's wrongful death, Plaintiff asserts claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

163.   More particularly, Plaintiff Roxanne Martone, in her capacities as heir-at-law to the Estate of Michael Martone, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act or as allowed by law.

110. Plaintiff Roxanne Martone, in her individual capacity asserting wrongful death claims, has incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Michael Martone; and,

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

111. Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also requests attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs requests that the Court:

A. Award compensatory damages, nominal and presumed damages against Defendants to the survivor plaintiffs;

B. Award punitive damages against the individual Defendants only under Section 1983, the Texas Tort Claims Act, and the Wrongful Death Act, and through the Survival Statute to the Plaintiff;

C.     Find that Plaintiff is the prevailing party in this case and award her attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.     Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
  Tel.  512-623-7727
  Fax. 512-623-7729

By     /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

  /s/Scott Medlock
Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS