**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ROXANNE MARTONE**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:13-CV-3369** |
| | § | |
| **BRAD LIVINGSTON**, *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

This lawsuit arises out of the heat-related death of a prisoner, Michael Martone, at the Huntsville Unit of the Texas Department of Criminal Justice (TDCJ).  Mr. Martone's daughter, Roxanne Martone, brings a § 1983 claim against Brad Livingston, Rick Thaler, William Stephens, Owen Murray, Richard Alford, James Jones, Lanette Linthicum, Patricia Rye, Peggy McCleskey, and Kerry Collard, in their individual capacities, for violations of Mr. Martone's right to protection from cruel and unusual punishment under the Eighth and Fourteenth Amendments.  Plaintiff also brings a claim against the TDCJ and the University of Texas Medical Branch (UTMB) for violating Title II of the Americans with Disabilities Act ("ADA"), the Americans with Disabilities Act Amendment Act ("ADAAA"), and Section 504 of the Rehabilitation Act of 1973, as well as a negligence claim against only UTMB.  (Doc. No. 1.)

Currently pending before the Court are Motions to Dismiss filed by Mr. Livingston, Mr. Thaler, and Mr. Stephens (Doc. No. 8), Dr. Murray (Doc. No. 27), Ms. Rye (Doc. No. 28), and UTMB (Doc. Nos. 26 and 42).[1]  After considering the Motions, the responses thereto, and the applicable law, the Court **DEFERS** a decision on the Motions to Dismiss filed by Mr.

---

[1] Dr. Linthicum also filed a Motion to Dismiss on the basis of qualified immunity (Doc. No. 15), but the Motion was subsequently withdrawn without prejudice (Doc. No. 56).

Livingston, Mr. Thaler, Mr. Stephens, and Dr. Murray, and **DENIES** the Motions to Dismiss filed by Ms. Rye and UTMB.

## I.   BACKGROUND

Temperatures routinely exceed 100 degrees at the Huntsville Unit in Texas over the summer months.  (Doc. No. 1 at ¶ 21.)  The apparent temperature – "the temperature plus the effect of humidity" – soars even higher.  (*Id.* at ¶¶ 25-26.)  Certain inmates are more vulnerable to the health risks of extreme temperatures since their medical conditions or medications prevent their bodies from regulating their temperature.  (*Id.* at ¶ 27.)  Plaintiff alleges that Defendants failed to protect Mr. Martone, an inmate with heat-sensitive medical conditions, from the extreme heat at the Huntsville Unit.  For the purposes of the Motions to Dismiss, the following factual allegations are taken as true.

Mr. Martone suffered from hypertension, depression, and obesity, each of which increased his susceptibility to heat stress.  (*Id.* at ¶¶ 100-10.)  In addition, medications prescribed to treat hypertension and depression placed Mr. Martone at yet greater risk of heat-related illness and death.  (*See id.* at ¶¶ 102-03 and 105.)  For example, diuretic medications, prescribed to treat hypertension, increase a patient's risk of heat stroke since they remove water from the blood to decrease blood pressure.  (*Id.* at ¶ 102.)  Beta blockers, also used to treat hypertension, "reduce the body's ability to sweat, which is necessary to dissipate heat."  (*Id.* at ¶ 103.)

On August 8, 2011, temperatures in the Huntsville area reached over 100 degrees Fahrenheit for the eighth consecutive day.  (*Id.* at ¶ 117.)  With up to 87 percent humidity, a temperature of 101 degrees would have felt closer to 110 degrees.  (*Id.* at ¶ 114.)  Yet, "[n]o one from UTMB or TDCJ did anything to cool the indoor temperatures or remove prisoners vulnerable to such extreme heat."  (*Id.* at ¶ 116.)

On this day, Officer Kerry Collard was responsible for supervising Mr. Martone's cell block.  (*Id.* at ¶ 118.)  Officer Collard sent Mr. Martone to the infirmary around 6:00 p.m. after Mr. Martone complained of feeling "very sick" for the past two days and throwing up.  (*Id.*)  As Sergeant Ford escorted Mr. Martone to the infirmary, Mr. Martone explained that he "was experiencing difficulty breathing, dizziness, and feeling very dry 'despite drinking mass amounts of water.'"  (*Id.* at ¶ 119.)

Peggy McCleskey, a licensed vocational nurse, was the only staff in the infirmary at that time.  (*Id.* at ¶ 120.)  "Uninterested in doing her job and performing even a basic evaluation of Martone, McCleskey simply preferred to make sure she left work on time."  (*Id.* at ¶ 121.)  Ms. McCleskey used videoconference to connect Mr. Martone with Patricia Rye, a registered nurse at another prison.  (*Id.* at ¶ 122.)  "Despite knowing Mr. Martone took medications that react dangerously with the heat to treat his disabilities, and he had been suffering classic symptoms of heat stroke for two days, Nurse Rye dismissed his concerns."  (*Id.* at ¶ 123.)  Ms. Rye told Mr. Martone that it was "nothing serious" and directed him to drink water, rest, and return to the infirmary in the morning.  (*Id.*)  Ms. Rye did not take his temperature or otherwise evaluate him for heat stroke.  (*Id.* at ¶ 124.)

Mr. Martone had no choice but to return to the heat of his cell block since the infirmary closed around 7:00 p.m. each day.  (*Id.* at ¶ 125.)  He returned to the stifling common area, talking to himself.  (*Id.* at ¶ 126.)  Officer Collard asked if he was alright, but Mr. Martone "was only able to mumble and could not respond."  (*Id.* at ¶ 126.)  Officer Collard did nothing further to assist Mr. Martone.  (*Id.* at ¶ 127.)

Less than an hour later, Officer Collard saw Mr. Martone grasping the bars on the cell block's windows.  (*Id.* at ¶ 128.)  Mr. Martone began convulsing and collapsed.  (*Id.*)  There was

no medical staff left for the night at the Huntsville Unit as Mr. Martone slipped in and out of consciousness.  (*Id.* at ¶¶ 128 and 130.)  "After at least a 20 minute delay, Collard's supervisors finally called 911."  (*Id.* at ¶ 131.)  The ambulance did not arrive until "about an hour after Martone first collapsed."  (*Id.*)  He was pronounced dead soon after he arrived in the emergency room.  (*Id.* at ¶ 133.)  At the time of his death, Mr. Martone's body temperature was 108 degrees. (*Id.* at ¶ 134.)

Mr. Martone was one of fourteen prisoners who have died in TDCJ prisons from heat-related causes since 2007.  (*Id.* at ¶ 28.)  The following table, taken from the Complaint, summarizes the deaths:

| Name | Age | Unit | Death of Death | Body Temp. | Medical History |
|------|-----|------|----------------|------------|-----------------|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | Hypertension, prescriped psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | Prescribed psychotropics |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | Hypertension, prescribed medication "known to interfere with heat dissipation" |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | Diabetic, prescribed diuretic |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | Hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | Developmentally disabled, prescribed psychotropics |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | Diabetic, prescribed psychotropics |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | Developmentally disabled, prescribed psychotropics |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | Prescribed diuretic |
| Kenneth Wayne | 52 | Gurney | Aug. 13, 2011 | 108 | Prescribed diuretic |

| James | | | | | |
|---|---|---|---|---|---|
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | Prescribed psychotropics |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | Prescribed psychotropics |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | |

(*See id.*)   TDCJ officials nevertheless stated that the "TDCJ was doing a 'wonderful job' and [didn't] have a problem with heat-related deaths."  (*Id.* at ¶ 32.)

Plaintiff alleges that the chain of command within TDCJ and UTMB did nothing to protect prisoners with heat-sensitive medical conditions, like Mr. Martone, from the extreme heat at the Huntsville Unit.  Brad Livingston is the Executive Director of the TDCJ.  (*Id.* at ¶ 8.)  Rick Thaler is the Director of TDCJ's Correctional Institutions Division, which manages all aspects of TDCJ's prison facilities.  (*Id.* at ¶ 10.)  William Stephens is the Deputy Director of TDCJ's Correctional Institutions Division.  (*Id.* at ¶ 11.)  Richard Alford supervised thirteen prisons in "Region I," of which the Huntsville Unit is one.  (*Id.* at ¶ 12.)  James Jones was the Warden for the Huntsville Unit.  (*Id.* at ¶ 8.)  Dr. Lanette Linthicum is the Director of TDCJ's Health Services Division, which supervises all medical care providers at all TDCJ facilities.  (*Id.* at ¶ 14.)  TDCJ has partnered with UTMB to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Huntsville Unit.  (*Id.* at ¶ 19.)  Dr. Owen Murray is the Chief Physician Executive for UTMB's Correctional Managed Care program.  (*Id.* at ¶ 13.)

According to Plaintiff, it was "well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions," like Mr. Martone, "are much more vulnerable to extreme temperatures."  (*Id.* at ¶ 27.)  The heat-related deaths "were regularly discussed at meetings Thaler and Stephens held with their deputies, including Alford."  (*Id.* at ¶ 33.)  TDCJ and UTMB promulgated policies that barred prisoners with heat-sensitive conditions

from "work[ing] or recreat[ing] in environments where the apparent air temperature is 95° F or higher." (*Id.* at ¶ 45.)   No action has been taken to protect prisoners with heat-sensitive conditions where they live and sleep. (*Id.* at ¶¶ 45-46.)

In addition to these hazardous conditions, Plaintiff alleges a policy whereby no medical staff is available at the Huntsville Unit between 7:00 p.m.[2] and 9:00 a.m. (*Id.* at ¶ 57.)  "Instead, prisoners needing after-hours medical care are evaluated by videoconference by nurses working at the nearby Estelle Unit, who are not capable of making medical treatment decisions." (*Id.* at ¶ 58.)

Finally, Plaintiff alleges that the training provided to officers and nurses "is grossly inadequate and effectively amounts to no training at all." (*Id.* at ¶ 62.)   The same training materials are read aloud to officers every year, and have not been updated despite the many heat-related deaths. (*Id.*)  Plaintiff alleges that "[l]arge portions of the 2010 circular even discussed preventing heat-related illnesses in pets." (*Id.* at ¶ 63.)

Plaintiff brought a claim under § 1983 against Defendants Mr. Livingston, Mr. Thaler, Mr. Stephens, Mr. Alford, Mr. Jones, Dr. Linthicum, Dr. Murray, Officer Collard, Ms. Rye, and Ms. McCleskey for violating his rights under the Eighth and Fourteenth Amendments. (*Id.* at ¶¶ 136-46.)  Plaintiff brought another claim against Defendants TDCJ and UTMB for violation of the Americans with Disabilities Act, Americans with Disabilities Act Amendment Act, and the Rehabilitation Act. (*Id.* at ¶¶ 147-54.)   Finally, Plaintiff brought a claim against Defendant UTMB for negligence. (*Id.* at ¶¶ 155-59.)

---

[2] In different places, the Complaint alleges that medical staff left the Huntsville Unit at 6:00 p.m. (*see* Doc. No. 1 at ¶¶ 57, 59, and 61),  and 7:00 p.m. (*id.* at ¶ 125).  For the sake of consistency, the Court uses the latter of the two times.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint must contain sufficient factual matter that, if it were accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S at 556).  The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than a "sheer possibility" that a defendant has acted unlawfully. *Id.*

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff.  The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678 (citation omitted).  The court should not "strain to find inferences favorable to the plaintiffs" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).  The court should not evaluate the merits of the allegations, but must satisfy itself only that plaintiff

has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

### B. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions from liability for civil damages so long as their conduct does not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). In the context of a motion to dismiss, the plaintiff's burden is discharged if "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (quoting *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995).

To overcome a defense of qualified immunity, the plaintiff must satisfy a "two-prong test." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, the plaintiff must allege that the defendants committed a constitutional violation under current law. *Id.* Second, the plaintiff must allege that "the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id.* The order by which the Court evaluates these two questions is now left to the Court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### III.   ANALYSIS FOR SUPERVISOR DEFENDANTS

Only one of the individual Defendants at issue, Ms. Rye, was personally involved in the events leading up to Mr. Martone's death. Executive Director Brad Livingston, Institutional Division Director Rick Thaler, and Deputy Institutional Division Director William Stephens

(hereinafter, "TDCJ Defendants") were the three highest ranking TDCJ Executives at the time of Mr. Martone's death. Dr. Owen Murray was the Chief Physician Executive for UTMB's Correctional Managed Care Program. The TDCJ Defendants and Dr. Murray assert that they are entitled to qualified immunity due to Plaintiff's failure to state a violation of a clearly established constitutional right, and assert that Plaintiff has failed to state a claim for relief under § 1983 absent allegations of their personal involvement. (Doc. Nos. 8 and 27.)

The Court addresses whether Plaintiff has stated a claim for relief under § 1983 before considering whether Plaintiff has alleged sufficient facts to defeat a qualified immunity defense. *See, e.g.*, *Tipps v. McCraw*, 2013 WL 5929705 (W.D. Tex. Nov. 1, 2013) (not reaching the question of qualified immunity since the plaintiff had failed to state a claim for relief for supervisory liability under § 1983). "Section 1983 provides a private right of action for violations of federal law by those acting under color of state law." *Wells v. Thaler*, 460 Fed. App'x 303, 308 (5th Cir. 2012). To bring a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). The first element overlaps with the first prong of the qualified immunity defense, which is challenged by Defendants, but there is no dispute as to the second element.

Section 1983 does not attach liability to supervisory officials for the misdeeds of their subordinates under a theory of vicarious liability or *respondeat superior*. *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Instead, "[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally

result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).  "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (emphasis in original).  Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 446-47. (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).

### A.  Mr. Livingston, Mr. Thaler, and Mr. Stephens

### 1.  Whether Plaintiff Stated a Claim for Relief Under § 1983

Plaintiff alleges that the TDCJ Defendants violated the Eighth and Fourteenth Amendments by subjecting Mr. Martone to "extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions."  (Doc. No. 1 at ¶ 137.)

The Eighth Amendment dictates that cruel and unusual punishment shall not be inflicted, and is applicable to the states by reason of the Due Process Clause of the Fourteenth Amendment. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004).  Two requirements must be met for an Eighth Amendment claim challenging conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  First, "the prison official's act or omission must be objectively serious, in that it 'result[s] in the denial of the minimal civilized measure of life's necessities." *Blackmon v. Garza*, 484 Fed. App'x 866, 869 (5th Cir. 2012) (quoting *Farmer*, 511 U.S. at 834). For a claim based on a failure to prevent harm, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  Second,

"the 'prison official must have a sufficiently culpable state of mind,' meaning that the official was 'deliberate[ly] indifferen[t] to inmate health or safety.'"  *Blackmon*, 484 Fed. App'x at 869 (quoting *Farmer*, 511 U.S. at 834).  To be deliberately indifferent, the prison official must know of and disregard an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. at 837.

In 2012, the Fifth Circuit considered an inmate's claim of an Eighth Amendment violation based on extreme heat at a TDCJ facility, and reversed the district court's grant of judgment as a matter of law in favor of the defendants.  *Blackmon v. Garza*, 484 Fed. App'x 866 (5th Cir. 2012).  The Fifth Circuit recognized that "[a]llowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment."  *Id.* at 869.  First, the Fifth Circuit found sufficient evidence to allow a jury to conclude that the extreme heat at the Texas prison "met the threshold for objective seriousness."  *Id.* at 870.  A reasonable jury could conclude that "the extreme heat in Blackmon's dorm caused substantial health risks to Blackmon – a prisoner who . . . was especially susceptible to the health risks of extreme heat because of his advanced age, pre-existing high blood pressure, and use of prescription medication."  *Id.* at 872. Second, the Fifth Circuit found sufficient evidence to allow a jury to conclude that the defendants were deliberately indifferent to this substantial health risk.  *Id.*  A reasonable jury could conclude that the defendants had "specific knowledge of the risks to Blackmon," or "that the heat-related health risks to Blackmon were obvious."  *Id.* at 873.

In this case, the Court finds that Plaintiff has sufficiently alleged a violation of Mr. Martone's Eighth Amendment rights.  It is beyond argument that the conditions of confinement posed a substantial risk of serious harm to Mr. Martone, who was especially susceptible to the health risks of extreme heat.  Though the risks are obvious, Plaintiff has also alleged that the TDCJ Defendants had actual knowledge of the substantial risk of serious harm.  Plaintiff alleges

that the TDCJ Defendants knew that the apparent temperature in TDCJ facilities regularly exceeded 100 degrees, and was particularly dangerous to inmates with certain medical conditions.  (Doc. No. 1 at ¶¶ 27 and 79-81.)  In 2010, Defendant Mr. Livingston was added as a named defendant in the *Blackmon* case, in which Mr. Blackmon complained of these same risks. *Blackmon*, 484 Fed. App'x at 868; *Blackmon v. Kukua*, No. 2:08-cv-00273 (Doc. No. 120) (S.D. Tex. Apr. 1, 2010).  All three of the TDCJ Defendants are alleged to have known that inmates were dying of heat stroke in TDCJ facilities. (*Id.* at ¶ 33.)  In recognition of the health risks, TDCJ prohibited prisoners with heat-sensitive conditions from working or recreating in environments where the apparent air temperature was 95 degrees or higher.  (*Id.* at ¶ 45.)  The TDCJ Defendants did nothing, however, to protect inmates like Mr. Martone from this known and substantial health risk.

"A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)). In this case, Plaintiff highlights four alleged failures by the TDCJ Defendants.  (Doc. No. 33 at 21.)  Specifically,

> a.) They approved policies that made no accommodation for vulnerable prisoners during periods of extreme temperatures;
>
> b.) They failed to provide climate controlled housing, or cool the Huntsville Unit's housing areas in any way, approving policies and practices that denied vulnerable prisoners safe housing;
>
> c.) They approved TDCJ policies that make no accommodations for housing people with medical conditions (like hypertension, obesity, and depression) known to cause medical emergencies and death during periods of extreme temperature; and
>
> [d].) They failed to provide after-hours medical care at prisons where they knew inmates were likely to suffer from heat-sensitive

medical conditions.

(*Id.*)

The Court must disregard the Plaintiff's fourth argument as insufficiently pled.  Plaintiff

cites to paragraphs 57 through 60 in the Complaint in support of this argument (Doc. No. 33 at

21 n.37), but these paragraphs largely attribute the policy decision to Dr. Murray, Dr. Linthicum,

and UTMB.  In paragraph 57, Plaintiff alleges that "Dr. Murray, Dr. Linthicum, and UTMB

choose not to employ any medical staff at the Huntsville Unit between [7]:00 p.m. and 9:00

a.m." (Doc. No. 1 at ¶ 57.)  Thus, "Dr. Linthicum, Dr. Murray and UTMB purposefully do not

provide access to doctors or competent medical providers capable of providing treatment

recommendations from [7]:00 p.m. to 9:00 a.m." (*Id.* at ¶ 59.)  Plaintiff includes the TDCJ

Defendants abruptly in paragraph 60 without explanation: "Livingston, Thaler, Stephens, Alford,

Linthicum, Murray, and UTMB made this decision for financial reasons . . ." (*Id.* at ¶ 60.)  The

Court disregards this conclusory insertion of the TDCJ Defendants into the policy decision at

issue.  Plaintiff is given leave to amend should she so choose.

Plaintiff's remaining arguments can be summarized as alleging that the TDCJ Defendants

failed to implement policies to protect vulnerable prisoners from extreme temperatures.  It was

not only obvious, but known, that the failure to protect heat-sensitive inmates from the extreme

temperatures would result in heat-related illness and death.  Indeed, fourteen prisoners died of

heat-related causes from 2007 through 2012. (Doc. No. 1 at ¶ 28.)  Plaintiff's allegations that the

TDCJ Defendants failed to act, despite their knowledge of the risks to heat-sensitive inmates and

the resulting heat-related deaths, rises to the level of deliberate indifference sufficient to state a

claim for supervisory liability under § 1983.

The TDCJ Defendants object that they cannot be held liable under § 1983 for the alleged

violation of the Eighth Amendment since there is no allegation of their personal involvement in the conditions of Mr. Martone's confinement.  (*See* Doc. No. 8 at 11.)  To the contrary, Plaintiff seeks to hold the TDCJ Defendants liable under a theory of supervisory liability for "creating and approving the dangerous conditions that *caused* [Mr. Martone's] heat stroke, and failing to remedy them."  (Doc. No. 33 at 24-25.)  Plaintiff has adequately alleged that the TDCJ Defendants acted, or failed to act, with deliberate indifference to constitutional violations as necessary for supervisory liability to attach under § 1983.  *See Porter*, 659 F.3d at 446.

## 2.  Whether Plaintiff Overcame Defendants' Qualified Immunity

The first prong of the qualified immunity analysis asks whether Plaintiff alleged a violation of constitutional rights under current law.  *Atteberry*, 430 F.3d at 253.  The Court has already determined that Plaintiff stated a violation of the Eighth Amendment sufficient to state a claim for relief under § 1983.  For the same reasons, the Court finds that Plaintiff stated a violation of the Eighth Amendment sufficient to satisfy the first prong of the qualified immunity analysis.

The TDCJ Defendants may nevertheless be immune from liability for their allegedly unconstitutional actions if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "[T]he salient question is whether the state of the law at the time of the incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Id.* (quoting *Hope*, 536 U.S. at 741) (internal quotation marks omitted).  "The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional

rights.'"  *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope*, 536 U.S. at 740).

The Court recognizes that the *Blackmon* decision, which provides the clearest iteration of a prisoner's right to be free from extreme temperatures, was not written until after Mr. Martone's death.  *Blackmon v. Garza*, 484 Fed. App'x 866 (5th Cir. 2012).  Nevertheless, two prior cases – relied upon by the Fifth Circuit in *Blackmon* – made clear that deliberate indifference to the probability of heat-related illness and death violated the Eighth Amendment.  In *Gates v. Cook*, the Fifth Circuit affirmed an injunction to provide fans, ice water, and daily showers when the heat index was 90 degrees or above since the heat presented a substantial risk of serious harm to the inmates to which the defendants were deliberately indifferent.  376 F.3d 323, 339-40 (5th Cir. 2004); *see also Blackmon*, 484 Fed. App'x at 869-70.   In *Valigura v. Mendoza*, the Fifth Circuit affirmed the denial of a motion for summary judgment based on evidence of an Eighth Amendment violation, including "excessive heat."  265 Fed. App'x 232, 235 (5th Cir. 2008); *see also Blackmon*, 484 Fed. App'x at 870.   Accordingly, a reasonable official would have understood that his failure to protect heat-sensitive inmates from the known risks of extreme heat violated the Eighth Amendment.[3]

The Court therefore finds that Plaintiff has alleged sufficient facts that would defeat qualified immunity, but significant unanswered questions cause this Court to hesitate before definitively ruling on this issue.  In parallel litigation within Texas, Judge Ramos and Judge Schneider have noted significant questions that are "particularly important when evaluating the second prong of the qualified immunity test – the reasonableness of [Defendants'] actions in light of the clearly established constitutional right."  *Webb v. Livingston*, No. 6:13-cv-711, 2014 WL 1049983, at *8 (E.D. Tex. Mar. 14, 2014) (Schneider, J.) (quoting *Morgan v. Hubert*, 335

---

[3] The Court does not hold that the TDCJ Defendants were required to provide air conditioning in the facilities, but that they were required to do more to protect prisoners in their care with heat-sensitive disabilities from the life-threatening conditions in which they lived.

Fed. App'x 466, 473 (5th Cir. 2009)); *Hinojosa v. Livingston*, No. 2:13-cv-319, 2014 WL 1276199, at \*7 (S.D. Tex. Mar. 27, 2014) (Ramos, J.).  Judge Ramos summarized the following issues:

- When and how the TDCJ Defendants learned about specific prisoner deaths . . . and/or serious injury related to extreme heat;

- Whether the TDCJ Defendants ordered that conditions be monitored or a study conducted regarding extreme heat and inmate safety;

- Their familiarity with Fifth Circuit case law addressing the dangers of heat within the context of the Eighth Amendment and whether or not policies were implemented or changed in accordance with such direction;

- Whether the TDCJ has performed any studies into the costs of reducing extreme temperatures within the dorms via more efficient systems, engineering modifications, or other facility upgrades;

- Whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months;

- Whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport;

- And whether the TDCJ Defendants received copies of notes, memoranda, emails, or other correspondence from TDCJ wardens concerning heat-related issues at their units and any administrative responses thereto.

*Hinojosa*, 2014 WL 1276199 at \*7.  As a result, Judge Schneider deferred the question of qualified immunity until discovery on the subject was complete.  *Webb*, 2014 WL 1049983, at \*8.  Judge Ramos denied the Defendants' Motion to Dismiss without deciding the question of qualified immunity.  *Hinojosa*, 2014 WL 1276199 at \*9 & n.6.

The Fifth Circuit delineated "a careful procedure under which a district court may defer

its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).  The Court must find that the plaintiff has pled "specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.*  "[I]f the court remains 'unable to rule on the immunity defense without further clarification of the facts,' it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'" *Id.* (citation omitted).

In this case, Plaintiff has pled specific facts that allow this Court to draw the reasonable inference that the TDCJ Defendants are liable under § 1983 for violations of Mr. Martone's Eighth and Fourteenth Amendment rights, and that defeat the TDCJ Defendants' assertion of qualified immunity.  The Court remains unable to rule on the second prong of the qualified immunity defense given outstanding factual questions.  Pursuant to the procedure established in *Backe*, the Court **DEFERS** ruling on qualified immunity and allows limited discovery to resolve the issue.  Discovery is limited to the personal knowledge and personal conduct of each Defendant as it relates to Mr. Martone and the circumstances that led to his death.[4]

---

[4] The Court adopts the guidelines for limited discovery put forth in the *Webb* and *Hinojosa* cases.  *See Webb*, 2014 WL 1049983, at *10; *Hinojosa*, 2014 WL 1276199 at *8.  Following their direction, discovery in this case may include the TDCJ Defendants' knowledge of extreme temperatures at the Huntsville Unit, including knowledge of any prisoner complaints to prison officials about the temperatures in the dorms or cells for the months of May through September for the years of 2007 through 2011.  Discovery may also relate to each Defendant's personal knowledge, if any, of the effects of extreme heat on pre-existing medical conditions, such as hypertension, depression, and obesity, and whether the TDCJ Defendants have knowledge or training concerning the interaction of medications with extreme heat.  Plaintiff may inquire into any advice that the TDCJ Defendants received or gave regarding the Huntsville Unit, Mr. Martone, and management of extreme temperatures as it relates to this case.  This may include discovery as to any policies or procedures adopted or in place to address prison operations when temperatures are considered to constitute extreme heat, and whether these policies or procedures, if any, were followed in this case.

**B.  Dr. Murray**

**1.  Whether Plaintiff Stated a Claim for Relief Under § 1983**

Plaintiff alleges that Dr. Murray violated the Eighth and Fourteenth Amendments by subjecting Mr. Martone to "extreme conditions of confinement" and denying him medical care. (Doc. No. 1 at ¶¶ 137-39, 143.)

As explained above, deliberate indifference to the objective health risks of extreme temperatures to heat-sensitive inmates constitutes an Eighth Amendment violation and states a claim under § 1983.  *See also Blackmon v. Garza*, 484 Fed. App'x at 869.  Plaintiff pleads that Dr. Murray, like the TDCJ Defendants, actually knew of the substantial health risks.  Dr. Murray had personally visited the Huntsville Unit and had remarked to the press that the cells were "blazing hot" in the summer.  (Doc. No. 1 at ¶ 38.)  He knew of the serious health risks associated with these extreme temperatures (*Id.* at ¶ 37), and reviewed reports from TDCJ's Emergency Action Center that tracked the heat-related injuries and deaths (*Id.* at ¶ 93).  Dr. Murray nevertheless did nothing to protect vulnerable prisoners, like Mr. Martone, from these known and obvious risks.  (*Id.* at ¶ 37, 139.)

Deliberate indifference to a prisoner's serious medical needs also constitutes an Eighth Amendment violation.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  "Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive adequate medical care."  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 832) (internal quotation marks omitted).  The denial of medical care violates the Eighth Amendment if it is the result of deliberate indifference to serious medical needs. *Estelle*, 429 U.S. at 104.  "The mere delay of medical care can also constitute an Eighth

Amendment violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Easter*, 429 F.3d at 463 (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

Plaintiff alleges that Mr. Martone failed to receive basic medical care while suffering heat stroke due to Dr. Murray's policy of keeping no medical staff at the Huntsville Unit between 7:00 p.m. and 9:00 a.m., and his failure to properly train the remaining staff. (Doc. No. 1 at ¶¶ 59 and 139.) Medical staff left the Huntsville Unit at 7:00 p.m. every night, and did not return until 9:00 a.m. the next morning. (*Id.* at ¶¶ 57 and 125.) For fourteen hours each night, no medical staff is on site. (*Id.* at ¶ 61.) Prisoners' only access to medical care overnight is to videoconference with licensed vocational nurses at another facility, who could not, by law, diagnose or treat patients. (*Id.* at ¶ 58.) In order for prisoners to receive immediate medical care overnight, they had to be transported to a hospital by ambulance. (*Id.* at ¶ 61.)

This policy institutionalized a delay in medical care, and may be better characterized as a denial of medical care given the allegations that the nurses, who stood between the inmates and their access to basic medical care, were insufficiently trained. (*Id.* at ¶ 62.) Far from "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, Dr. Murray is alleged to have purposefully left the prisoners without adequate medical care overnight, and failed to train the available remote nurses about the dangers of the extreme temperatures. The serious risk posed by the delay, or possible denial, of medical care is highlighted by the fact that most of the men who have died of heat stroke since 2007 "collapsed in the middle of the night, or were found dead early in the morning." (Doc. No. 1 at ¶ 31.) Given his knowledge of the weather conditions, the number of prisoners whose health made them especially vulnerable to intense heat, and the prior heat-related deaths, Dr. Murray's actions rise to the level of deliberate

indifference.

Like the TDCJ Defendants, Dr. Murray argues that Plaintiff has failed to allege facts sufficient to establish supervisory liability under § 1983. (*See* Doc. No. 27 at 10-11.)   Plaintiff responds that Dr. Murray can be held liable for his actions as a policymaker and supervisor.  As the Chief Physician Executive for UTMB's Correctional Managed Care Program, Dr. Murray "oversees the medical, mental health, and dental services provided to prisoners within more than 100 units." (Doc. No. 1 at ¶ 13.)  Plaintiff specifies that Dr. Murray is not being sued as Mr. Martone's treating physician, but as the UTMB policymaker who failed to protect inmates from the extreme temperatures and the corresponding medical risks.   (Doc. No. 32 at 13.) Specifically, Plaintiff alleges that Dr. Murray (1) failed to implement policies that protected heat-sensitive inmates from extreme heat, (2) ended after-hours medical care at the Huntsville Unit, and (3) failed to train prison employees about the dangers of extreme temperatures. (*Id.* at 10-13.)

The first argument concerns Dr. Murray's failure to implement policies.  As with the TDCJ Defendants, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (quoting *Rhyne*, 973 F.2d at 392).  Plaintiff alleges that Dr. Murray knew of the extreme heat and the danger this posed to inmates with certain health conditions. (Doc. No. 1 at ¶¶ 37-38.)  "However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the Huntsville Unit and other prisons routinely exceed 100 degrees in the summer, . . . Dr. Murray [has] not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat." (*Id.* at ¶ 46.)  In light of Dr. Murray's alleged knowledge, the

Court finds that his failure to adopt a policy to protect heat-sensitive inmates sufficiently pleads deliberate indifference for supervisory liability.

The second argument concerns Dr. Murray's policy of ending after-hours medical care. To find supervisory liability for a policy, the policy must be "so deficient that the policy itself is a repudiation of constitutional rights, and is the moving force of the constitutional violation." *Brown v. Bolin*, 500 Fed. App'x 309, 314 (5th Cir. 2012) (citing *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)).  The Supreme Court has held that "the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated."  *West v. Atkins*, 487 U.S. 42, 54 (1988).  In this case, Plaintiff alleges that Dr. Murray "purposefully do[es] not provide access to doctors or competent medical providers capable of providing treatment recommendations from [7]:00 p.m. to 9:00 a.m." (Doc. No. 1 at ¶ 59.)  Especially in light of the number of previous heat-related deaths, and the known vulnerabilities of many of the inmates, Dr. Murray's alleged policy left inmates at the Huntsville Unit without a system of access to adequate medical care for fourteen hours, and resulted in Mr. Martone's death.  The Court finds these allegations sufficient to state a claim for deliberate indifference under § 1983.

The third argument concerns Dr. Murray's failure to adequately train medical professionals to identify heat-related trauma.  A supervisor may be liable for failure to train or supervise if "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998)); *Porter*, 659 F.3d at 446.  Plaintiff alleges that Dr. Murray and Dr. Lanette

Linthicum were responsible for training the nurses who staff UTMB's infirmaries. (Doc. No. 1 at ¶ 64.) According to the Complaint, training to identify heat-related illnesses consisted of no more than listening to a training circular, which focused on "employees staying hydrated" and discussed "preventing heat-related illness in pets," as it was read aloud. (*Id.* at ¶¶ 62-63.) Plaintiff alleges that this failure to train the nurses to recognize symptoms of heat stroke resulted in more heat-related deaths, including Mr. Martone's. (*Id.* at ¶ 64.) The Court finds this failure to adequately train nurses to recognize the symptoms of heat stroke, despite Dr. Murray's knowledge of the extreme heat and the recent heat-related deaths, sufficiently pleads deliberate indifference.

### 2. Whether Plaintiff Overcame Defendant's Qualified Immunity

For the same reasons described above, the Court finds that Plaintiff has adequately stated violations of the Eighth Amendment based on Dr. Murray's alleged failure to implement policies to protect inmates from the extreme heat, alleged policy of leaving the inmates without adequate medical care each night, and alleged failure to adequately train the staff about the risk of heat stroke.

The second prong of the qualified immunity analysis asks whether the Defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Atteberry*, 430 F.3d at 253. As explained above, the constitutional imperative to protect inmates from the risks inherent in extreme temperatures was clearly established at the time of Mr. Martone's death. Dr. Murray's failure to protect heat-sensitive inmates from the known risk of death due to the extreme temperatures at the Huntsville Unit was objectively unreasonable in light of this clearly established law.

The Court also finds that the constitutional imperative to "provide medical care for those

whom [the government] is punishing" has been clearly established for many years. *See Estelle*, 429 U.S. at 103. At oral argument, counsel for Dr. Murray noted that there is no clear case law requiring the on-site presence of medical staff at all hours. (*See also* Doc. No. 8 at 9 ("The [Fifth] Circuit has never held that use of video conferencing and a local private medical hospital for care, violates clearly established law, when a correctional facility relies on these alternatives to provide medical care to its offenders during certain time periods.")) The contours of the law are clearly established, however, that the denial or delay of adequate medical care constitutes a violation of the Eighth Amendment. *See Easter*, 459 F.3d at 463. In *Bias v. Woods*, for example, the Fifth Circuit affirmed the district court's denial of qualified immunity when a doctor transported an inmate in need of immediate medical attention to a prison unit 150 miles away since "a reasonable person would have known that her conduct . . . would cause a significant delay, if not a complete denial, of medical care." 288 Fed. App'x 158, 162-63 (5th Cir. 2008).[5] In this case, Dr. Murray left inmates for fourteen hours with no more than videoconference capabilities to nurses, who were inadequately trained to recognize the symptoms of heat stroke, despite the serious risk of heat-related illness and death during the summer months in Texas. Dr. Murray's policy necessarily contemplated a significant delay, if not complete denial, of adequate medical care in violation of clearly established law.

---

[5] More recently, the Fifth Circuit expressed its concern with a policy that staffed the Wichita County Jail with licensed vocational nurses overnight when these nurses were inadequately trained and were discouraged from calling the supervising physician after-hours. *Brown v. Bolin*, 500 Fed. App'x 309, 313, 317 (5th Cir. 2012). The Fifth Circuit stated that the pretrial detainee "had a *clearly established* Fourteenth Amendment right not to be denied medical care as a result of deliberate indifference." *Id.* at 312 (emphasis added). The Fifth Circuit held that the supervising physician was immune from liability since he did not know of the decedent's medical problems or that the broader system of medical care was deficient. *Id.* at 315-16. As summarized in Judge Dennis's partial concurrence and partial dissent, the majority held that the supervising physician "should not be held liable because there was insufficient evidence that he knew his policy of nighttime inaccessibility for medical advice or authorization of emergency hospitalization would cause substantial risk of harm to prisoners due to their inadequate medical treatment at the jail." *Id.* at 318 (Dennis, J., concurring in part and dissenting in part). The majority noted that "there have been two documented cases of improper assessment by the nursing staff at the jail since Brown's death . . . [which] may be sufficient to put the [defendants] on notice that their present policies may be likely to endanger the constitutional rights of the inmates in the Wichita County Jail." *Id.* at 317. In this case, there can be no question that Dr. Murray knew of the system's inadequacy due to the recurring heat-related deaths overnight.

As with the TDCJ Defendants, the Court remains unable to rule on the immunity defense without further clarification of the facts, particularly as they relate to the reasonableness question.  In addition, the Court requires more information as to the delay resulting from Dr. Murray's policy of leaving the Huntsville Unit's infirmary unstaffed overnight.  Pursuant to the procedure established in *Backe*, the Court **DEFERS** ruling on qualified immunity and allows limited discovery.  Discovery is limited to the personal knowledge and personal conduct of Dr. Murray as it relates to Mr. Martone and the circumstances that led to his death.

## IV.    ANALYSIS FOR MS. RYE

Ms. Rye was the registered nurse who spoke with Mr. Martone via videoconference on the night of his death.  (Doc. No. 1 at ¶ 15.)  Plaintiff brings a § 1983 claim against Ms. Rye for denial of medical care in violation of his Eighth and Fourteenth Amendment rights.  Ms. Rye moves to dismiss Plaintiff's claim against her based on qualified immunity.  (Doc. No. 28.)  She argues that Plaintiff fails to specify facts that meet the high standard of deliberate indifference required for an Eighth Amendment violation, and fails to allege that Ms. Rye's actions were objectively unreasonable in light of the facts and circumstances that existed at the time.  (*Id.* at 7.)

To satisfy the first prong of the qualified immunity analysis, Plaintiff must allege that Ms. Rye acted with deliberate indifference to Mr. Martone's serious health needs, in violation of the Eighth Amendment.  To be deliberately indifferent, a defendant must "know[] of and disregard[] an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  "Deliberate indifference is an extremely high standard to meet."  *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  "It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Rather the plaintiff must show that

the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "Furthermore, the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Id.* (quoting *Estelle*, 429 U.S. at 107.) "[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004).

Plaintiff alleges that Ms. Rye was "uninterested in treating Martone." (Doc. No. 1 at ¶ 123.) Plaintiff sketches the following interaction between Mr. Martone and Ms. Rye:

> Despite knowing Mr. Martone took medications that react dangerously with the heat to treat his disabilities, and he had been suffering classic symptoms of heat stroke for two days, Nurse Rye dismissed his concerns. Rye told Martone it was 'nothing serious.' Rye merely said to drink water and 'rest.' She told him to go to sleep and 'see medical when they returned in the morning. Rye did not take his temperature, or otherwise evaluate him for heat stroke. Despite his obviously precarious condition and request for help, Rye ordered the correctional officers to take Mr. Martone back to the cell block.

(*Id.* at ¶¶ 123-24.) Plaintiff argues that this cursory conversation does not amount to an "examination" of Mr. Martone. (Doc. No. 35 at 6.) Ms. Rye "took no steps to make a medical assessment of Martone – she did not even take his temperature, which was likely extremely elevated as it soon reached 108, or record any other vital signs." (*Id.*)

Ms. Rye argues that the facts alleged do not and cannot show that "Ms. Rye refused to treat plaintiff, ignored his complaints, or even that she perceived any risk of serious harm to Martone's health." (Doc. No. 28 at 7.) According to the Complaint, Ms. Rye told Mr. Martone that his condition was "nothing serious." (Doc. No. 1 at ¶ 123.) At oral argument, counsel for

Ms. Rye argued that this negates the necessary knowledge component for an Eighth Amendment violation.  Furthermore, Plaintiff alleges facts that show that Ms. Rye saw Mr. Martone and gave him instructions to drink water, rest, and see a medical provider if he did not feel well in the morning.  (*Id.*)  Ms. Rye argues that these facts do not rise to the level of deliberate indifference. (Doc. No. 28 at 7.)

After reviewing the allegations, the Court finds that Plaintiff has adequately pled Ms. Rye's deliberate indifference to Mr. Martone's serious health needs.  Plaintiff alleges that Ms. Rye knew that Mr. Martone took medications that react dangerously with the heat, and that he had been suffering classic symptoms of heat stroke for two days.  (Doc. No. 1 at ¶ 123.)  The fact that she may have told Mr. Martone that it was "nothing serious" does not negate her alleged knowledge to the contrary.  Despite her alleged knowledge of Mr. Martone's symptoms and medications, Ms. Rye failed to take the rudimentary step of taking Mr. Martone's vital signs. (*Id.* at ¶ 124.)  In so doing, Ms. Rye essentially refused to treat Mr. Martone.  The Court finds the Eleventh Circuit persuasive in its logic that "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."  *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989); *see also Bingham v. Thomas,* 654 F.3d 1171, 1176 (11th Cir. 2011).

Ms. Rye may ultimately prove that she did not know of Mr. Martone's symptoms, or made a tragic misdiagnosis.  At this stage, the Court finds that Plaintiff's allegations allow the Court to draw the reasonable inference that Ms. Rye was deliberately indifferent when she failed to investigate the known symptoms of heat stroke presented by Mr. Martone hours before his death.  *See, e.g.*, *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2434289, at *7 (S.D. Tex. Aug. 21, 2006) (holding that a jury could find deliberate indifference based in part on the

defendant's failure to take the inmate's pulse, attempt CPR, or conduct a serious examination of him).

The second prong of the qualified immunity analysis requires this Court to consider whether "the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citation omitted). "Since *Estelle v. Gamble*, state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment." *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (internal citation omitted). Plaintiff alleges that Ms. Rye failed to take Mr. Martone's vital signs despite knowledge that he had exhibited classic symptoms of heat stroke for two days, and was on medication that made him particularly sensitive to heat stroke. Ms. Rye's actions were objectively unreasonable in light of the clearly established law.

Based on the allegations in Plaintiff's Complaint, Ms. Rye is not entitled to qualified immunity. The Court **DENIES** her Motion to Dismiss.

## V.   ANALYSIS FOR UTMB

UTMB "partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Huntsville Unit." (Doc. No. 1 at ¶ 19.) Plaintiff alleges that UTMB violated the ADA, the ADAAA, and the Rehabilitation Act, and negligently provided prescription drugs to Mr. Martone. (*Id.* at ¶¶ 147-59.) In UTMB's original Motion to Dismiss, UTMB argued that Plaintiff's claims under the ADA and the Rehabilitation Act should be dismissed for failure to state a claim, and that Plaintiff's claim under the Texas Tort Claims Act ("TTCA") should be dismissed for lack of subject matter jurisdiction. (Doc. No. 26.) In UTMB's Amended Motion to Dismiss, UTMB argues only that Plaintiff failed to state a claim

under the ADA and the Rehabilitation Act. (Doc. No. 42.) At oral argument, counsel for UTMB again raised the contention that the Court lacks subject matter jurisdiction over the TTCA claim. The Court considers both arguments, but finds neither persuasive.

### A. Whether Plaintiff Stated a Claim Under the ADA, the ADAAA, and the Rehabilitation Act

Plaintiff alleges that "TDCJ's officers and UTMB's employees intentionally discriminated against [Mr. Martone], under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life." (Doc. No. 1 at ¶ 151.) The language of Title II of the ADA largely tracks the language of Section 504 of the Rehabilitation Act of 1973, and "specifically provides that '[t]he remedies, procedures and rights' available under Section 504 shall be the same as those available under Title II." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12133). "A disabled plaintiff can succeed in an action under Title II if he can show that, by reason of his disability, he was either 'excluded from participation in or denied the benefits of the services, programs, or activities of a public entity,' or was otherwise 'subjected to discrimination by any such entity.'" *Id.* (quoting 42 U.S.C. § 12132). A disabled plaintiff can succeed in an action under Section 504 if he can show that, *solely* by reason of his disability, he was "excluded from participation in," "denied the benefits of," or "subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.[6]

UTMB first denies that Mr. Martone was disabled as defined by the ADA or the

---

[6] The Fifth Circuit found that "[t]he only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The different causation requirements, however, are irrelevant when a plaintiff's claim is premised on a defendant's failure to make reasonable accommodations for disabled individuals. *Id.* at 454-55. "Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." *Id.*

Rehabilitation Act.  (Doc. No. 42 at 1.)  An individual is "disabled" under these statutes if he has "a physical or mental impairment that substantially limits one or more [of his] major life activities."  42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(20)(B).  Plaintiff alleges that Mr. Martone suffered from depression, hypertension, and obesity, and thus sufficiently pleads a disability. (Doc. No. 1 at ¶¶ 100-10.)

UTMB next denies that Mr. Martone was discriminated against because of his disability. (Doc. No. 42 at 2.)  In the prison context, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."  *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006).  In this case, Plaintiff alleges that UTMB's failure to make accommodations for Mr. Martone's known disabilities led to his death.  (Doc. No. 1 at ¶¶ 151-53.)

UTMB responds that Plaintiff has failed to specify "what they believe defendant UTMB should have done or not done" about the extreme heat.  (Doc. No. 42 at 2.)  Plaintiff's Complaint specifically identifies alleged failures in UTMB's housing recommendations and medical staffing.  Plaintiff alleges that "UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk."  (Doc. No. 1 at ¶ 47.)  UTMB makes no such recommendations, however, for prisoners with heat-sensitive disabilities.  (*Id.*)  Furthermore, Plaintiff alleges that UTMB chose not to employ any medical staff at the Huntsville Unit between 7:00 p.m. and 9:00 a.m., "even though over 1,700 men are housed there every night and significant numbers (greater than 10%) suffer from hypertension, take medications for serious medical illnesses, or are

otherwise at greater risk from the extreme heat." (*Id.* at ¶ 57.) The Court finds these allegations sufficient to state a claim for relief under the ADA, the ADAAA, and Rehabilitation Act.

### B.  Whether This Court Has Jurisdiction Over the TTCA Claim

Plaintiff also brings a claim against UTMB for negligently prescribing prescription drugs to Mr. Martone that increased his risk of heat stroke. (Doc. No. 1 at ¶¶ 155-59.) The TTCA provides that "[a] suit under this chapter shall be brought in state court in the county in which the cause of action or a part of the cause of action arises." Tex. Civ. Prac. & Rem. Code § 101.102(a). UTMB argues that "[t]he TTCA waives sovereign immunity in state court only," and that "the Eleventh Amendment bars [Plaintiff's] TTCA claim against UTMB." (Doc. No. 26 at 6.)

This Court has original jurisdiction over Plaintiff's federal claims, and supplemental jurisdiction over her related state law claims under 28 U.S.C. § 1367. There is no dispute that this Court has original jurisdiction over Plaintiff's ADA, ADAAA, and Rehabilitation Act claims. The Court exercises supplemental jurisdiction over the related TTCA claim. *See Jackson v. Sheriff of Ellis Cnty., Tex.*, 154 F. Supp. 2d 917, 920 (N.D. Tex. 2001) (finding that "the federal district courts in this circuit have consistently held that "this 'venue' statute does not defeat federal jurisdiction over lawsuits brought under the Act'").

### VI.    CONCLUSION

The Court **DEFERS** a decision on the qualified immunity of the TDCJ Defendants and Dr. Murray. Although Plaintiff has pled sufficient facts to allow the Court to draw the reasonable inference that these Defendants are liable for the harm alleged and not protected by qualified immunity, outstanding factual questions remain as to the reasonableness of their actions in light of the clearly established law. For this reason, the Court allows limited discovery into

the personal knowledge and personal actions of each of these Defendants with respect to the policies, and lack thereof, that ultimately led to Mr. Martone's death.

The Court **DENIES** the Motions to Dismiss filed by Ms. Rye and UTMB.  The Court finds that Plaintiff has adequately alleged that Ms. Rye was deliberately indifferent to the serious medical needs of Mr. Martone, and that her actions were unreasonable in light of the clearly established law.  The Court also finds that Plaintiff has adequately alleged a violation of the ADA, ADAAA, and Rehabilitation Act against UTMB, and that it has subject matter jurisdiction over Plaintiff's negligence claim.

The TDCJ Defendants objected to Plaintiff's discovery requests and moved to stay discovery until the Court ruled on the pending Motions to Dismiss on the basis of qualified immunity.  (Doc. No. 60.)  Shortly thereafter, all Defendants filed a Joint Motion to Stay All New Discovery pending the Court's resolution of these Motions.  (Doc. No. 62.)  The Court hereby **DENIES AS MOOT** the Motions to Stay given this decision on the Motions to Dismiss.

**IT IS SO ORDERED.**

**SIGNED** on this the 16th day of July, 2014.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE